John M. Callagy
Andrea L. Calvaruso
Ana Y. Correa
**KELLEY DRYE & WARREN LLP**
101 Park Avenue
New York, New York  10178
Telephone: (212) 808-7800
Facsimile:  (212) 808-7897

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

JUDGE McMAHON

SAKS INCORPORATED,

     Plaintiff,

     v.

ATTACHMATE CORPORATION,

     Defendant.

Case No:

**14 CV 4902**

**COMPLAINT**

RECEIVED
JUN 30 2014
U.S.D.C. S.D.N.Y.
CASHIERS

JURY TRIAL DEMANDED

Plaintiff Saks Incorporated ("Saks"), by and through its attorneys, Kelley Drye &

Warren LLP, alleges:

### NATURE OF THE ACTION

1.     This is a civil action arising under the Declaratory Judgment Act, 28 U.S.C. §§

2201 and 2202, for a declaration that Saks has not infringed any valid copyright of Attachmate

Corporation ("Attachmate") and has not breached any contract between Saks and Attachmate.

Alternatively, this action is for breach of contract by Attachmate for failure to comply with its

contractual obligations.

### PARTIES

2.     Saks is a Tennessee corporation with its principal place of business located at 12

East 49th Street, New York, NY, 10017.

3.      Upon information and belief, Defendant Attachmate is a corporation organized under the laws of the State of Washington, with its principal place of business located at 705 5th Avenue South, Suite 1100, Seattle, WA, 98104.  Attachmate is in the business of licensing various software products.

## JURISDICTION AND VENUE

4.      By this action, Saks seeks a declaratory judgment that: a) Saks has not breached any contract between Saks and Attachmate; b) Saks has not infringed any valid copyright of Attachmate; and c) if a contract exists between Saks and Attachmate, Attachmate has breached the contract.

5.      This Court has subject matter jurisdiction over these claims pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02; pursuant to 28 U.S.C. §§ 1367 and 1332, in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states; pursuant to 28 U.S.C. §§ 1331 and 1338 over causes of action arising under the Copyright Act; and pursuant to 28 U.S.C. §§ 1338 and 1367 over causes of action for related breach of contract claims.

6.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391, 1400(a), in that Attachmate is subject to personal jurisdiction in this District based on its substantial and regular business activities in the District.  Attachmate maintains an office and is registered to conduct business in the state of New York.

## FACTUAL BACKGROUND

### The Agreement

7.      Saks owns and operates Saks Fifth Avenue luxury retail department stores and e-commerce sites throughout the United States.

8.    Attachmate produces and licenses computer software. Attachmate's line of software includes EXTRA! X-treme terminal emulation software and KEA! X software.

9.    Saks has over time purchased various software products from Attachmate, including Extra! X-treme legacy products, namely versions 8.0 and 8.10 of Extra! Mainframe Server Edition, Version 5 of the KEA! X software, and various versions of the Reflection brand software.

10.    Attachmate's default method of conveying an offer of license and its terms is through a click-wrap or click-through license model, whereby the terms of the license are accepted by the purchaser of the software at the time of installation or download.

11.    After purchase from Attachmate, Saks downloaded and installed Attachmate's Extra! Mainframe Server Edition versions 8.0 and 8.10 software (the "Extra Software Product") onto four of Saks' remote network servers.

12.    Saks and Attachmate did not negotiate a formal written agreement regarding purchase and use of the Extra Software Product, and neither party has conclusive evidence that a click-wrap license was accepted.

13.    Attachmate contends that Saks agreed to the terms of the Attachmate Software License Agreement ("ASLA") by clicking "accept" during the process of installing the Extra Software Products onto the Saks computers.  A representative copy of the ASLA is attached hereto as Exhibit A.

14.    The ASLA provides that a user may install the Extra Software Products on a network server, provided that the user has acquired licenses for each device that has the "ability to access and use directly or indirectly [the Extra Software Product] from such network server." (Exhibit A, ¶ 2(b))

15.     In the event that a user has more devices with the ability to access the Extra Software Products than the number of purchased licenses, the ASLA also states that it must compensate Attachmate in the amount of the applicable license fee for any such additional units. Specifically, the ASLA states that: "[i]f an audit reveals that you possess or at any time possessed unlicensed copies of the [Extra Software Product], you will promptly pay Attachmate the applicable license fees for such unlicensed copies." (Exhibit A, ¶ 11)

16.     Paragraph 11 of the ASLA provides, *inter alia,* that Attachmate "may inspect and audit [licensee's] computers and records for compliance with this License Agreement." Paragraph 11 of the ASLA specifically provides that the licensee agrees to:

> …an Attachmate representative or an independent auditor selected by Attachmate may inspect and audit your computers and records for compliance with this License Agreement and Licensed Unit(s) Certificate, during your normal business hours. . . . If an audit reveals that you possess or at any time possessed unlicensed copies the SOFTWARE, you will promptly pay Attachmate the applicable license fees for such unlicensed copies.

(Exhibit A, ¶ 11).

## Saks' Limited and Controlled Use of and Access to the Extra Software Product

17.     Saks has at all times controlled and limited its employees' access to the Extra Software Program on the network servers.

18.     Saks centrally controls the desktops and icons of its employees, and limits which network servers its employees can directly access.

19.     Saks employees may access the Extra Software Products in one of two ways. First, approximately 1,133 of Saks' computers have a copy of the Extra Software Products installed locally on their hard drives.  Second, approximately 300 additional Saks devices have a desktop icon for the Extra Software Products via which users can click to access the Extra Software Products located on Saks' remote servers.

20.     If a Saks computer does not have either a copy of the Extra Software Products loaded onto its hard drive, or a desktop icon that provides direct access to a copy of the software located on Saks' remote servers, a typical Saks employee cannot access the Extra Software Product.

21.     Absent the presence of a desktop icon for the Extra Software Product, which connects a user directly to the Extra Software Products on a remote server, only persons employed in the company's IT department, who possess the very specific technical knowledge necessary to manually connect to the Saks remote servers, may access the Extra Software Products located on those servers.

22.     In particular, manually accessing the remote servers which house the Extra Software Products via a Saks desktop computer or laptop would require a user to engage in the following behavior:

a.   Click "Start" -> Select "All Programs" -> Select "Accessories" -> Select "Remote Desktop Connection;

b.   In the "Remote Desktop Connection" box that appears, type in the full 8-12 digit alphanumeric combination that identifies the specific name and path of the server to which the user needs to connect.  Except for ten (10) employees in Saks' IT Department, no users possess the server and path information necessary to manually access the servers where the Extra Software Products is located;

c.   Once the user types in the identification code, she must click "Yes" to verify the connection to the server;

d.   Type in a username and password and press enter; and

e.   Once connected to one of the servers, the user must then need to navigate the server menus to find the Extra Software Product.

23.     Similarly, manually connecting to one of the four servers from devices which allow connectivity to Saks' computer system but do not contain a hard drive (a "Saks Thin Client" device), would require a user to engage in the following behavior:

a.   Click "Start" -> Select "Shut Down" -> Select "Logout" -> Click "OK";

b.   Once the "AutoLogin" screen appears hold the "Alt" key on the keyboard and press the "F4" button;

c.   Once the user presses "Alt – F4", the user will then be prompted to enter an Administrator Username and Password to continue.  Only approximately twenty eight (28) of Saks' employees in the IT Department possess such an Administrator User Name and Password;

d.   Type in the local Administrator Username and Password and press "enter";

e.   Select "Microsoft Remote Desktop Client" from the dropdown menu and click "OK";

f.   In the "Remote Desktop Connection" box that appears, type in the full 8-12 digit alphanumeric combination that identify the specific name and path  of the server to which the user needs to connect.  Except for the ten (10) employees in Saks' IT Department, no users possess the server and path information necessary to access the servers where the Extra Software Products is located;

g.   Take the default selections by clicking "Next" until the Microsoft "set-up wizard" completes and click "Finish" on the last selection; and

h.   Once connected to one of the servers, the user would then need to navigate to the Extra Software Products to access the product.

24.   Upon information and belief, only individuals in Saks' server team, consisting of ten (10) individuals, possess the technical knowledge required to manually connect a computer device to the remote servers.

25.   In fact, Saks' records indicate that only about 300 unique computer devices located in Saks' distribution center have accessed the Extra Software Products located on the remote servers.  This is less than the number of licenses for the Extra Software Products Attachmate contends Saks purchased.  Indeed, only Saks' employees who work within its distribution center would have any use for the Extra Software Product.

26.   In the event that a Saks user managed to connect to one of the network servers and access the Extra Software Product, the Extra Software Products would not actually be copied and

downloaded on the user's device.  The software would run from the server, not the end-user device.

27.    A further limitation to accessing the Extra Software Products located on the Saks network servers is that at most only 1,943 remote desktop sessions can occur simultaneously. This means that even if a user possessed the technical knowledge and access codes necessary to manually access the servers, at most only 1,943 devices were capable of accessing the four remote servers and the Extra Software Products located there.

28.    Saks owns only 1,943 licenses for the Windows Server Client Access software.  In order for a Saks user to log onto her Windows desktop and access the remote desktop session, she must utilize the Windows Server Client Access software.  This Windows Software has an automatic policing component that prevents Saks users from utilizing more than the 1,943 licenses purchased by Saks.  Therefore, if a 1,944th Saks user attempted to logon to a remote desktop session, the system would deny her entry to the server.

29.    Accordingly, only a small number of computer devices actually had the ability to access the remote network servers where the Extra Software Products is located.  In fact, the number of potential users of the remote network servers is less than the number of licenses for the Extra Software Products that Attachmate contends Saks purchased.  Therefore, the number of Saks' devices with remote access to the Extra Software Products has not, and could not have, exceeded the number of licenses Saks purchased for the software at any point in time.

**Attachmate's Audit of Saks and Subsequent Payment Demands**

30.    On or around November 4, 2013, Attachmate requested verification of Saks' compliance with the ASLA.

31.    In or around mid-December 2013, Attachmate commissioned Deloitte and Touche, LLP to conduct an audit of Saks' use of the Extra Software Product.

32.    Attachmate thereafter asserted that as a result of Saks' installation of a copy of the Extra Software Products onto Saks' network servers, it is bound by the ASLA which requires Saks to purchase licenses for each computer device that potentially has access to Saks' network servers.

33.    Attachmate claims the audit revealed that 6,001 unique devices potentially had access to Saks' network servers where the Extra Software Products was located, and therefore each one of those devices required a separate license for the Extra Software Product. Attachmate alleges that Saks has only purchased 2,361 licenses and that Saks must therefore purchase approximately 3,640 additional licenses.

34.    Attachmate does not allege that the Extra Software Products was accessed, copied, downloaded, used or displayed by 6,001 unique Saks devices or users.

35.    Saks informed Attachmate that it disagreed with Attachmate's assessment regarding the results of the audit and the amount of potential fees it owed, if any, for additional licenses for the Extra Software Product. The parties thereafter began discussions regarding the results of the audit and the parties' resulting obligations.

**The Parties' Present Dispute**

36.    The parties presently dispute the number of additional licenses, if any, that Saks is required to purchase.

37.    Attachmate contends Saks must purchase 3,640 additional licenses for the Extra Software Product. Saks is not required to purchase 3,640 licenses for the Extra Software Products and has refused to do so.

38.    On or about March 24, 2014, an attorney in Attachmate's corporate legal department informed Saks that its potential exposure as a result of the alleged license shortfall could reach more than $6.4 million. (A copy of the letter is attached hereto as Exhibit B.)

Attachmate's lawyer warned Saks that it would be forced to "escalate" the situation if Saks did not comply with Attachmate's demands to purchase thousands of licenses.

39.  Saks offered to purchase additional licenses for the Extra Software Products to meet Saks' internal business needs.

40.  Attachmate refused Saks' offer to purchase additional licenses for the Extra Software Program, maintaining its contention that Saks must purchase approximately 3,640 additional licenses.

41.  Attachmate has made veiled threats to Saks, via carefully crafted correspondence, that failure to accept its sales terms would result in Attachmate's sales department handing the matter over to the legal department for litigation.

42.  In addition to the March 24, 2014 letter from Attachmate's Senior Counsel in the legal department which threatened "escalation" of the matter for failure to comply with the demands of the compliance department, in May 2014, Attachmate's sales representative, Colin Dilley, informed Saks' business representative that he had "observed this process many times over the years" and had a "sense of the growing temperament and likely next steps" from Attachmate's compliance team.  Dilley cautioned Saks' business representative that "that there will be a time in short order that my hands will be 100% tied or possibly asked to leave the table."  Indeed, Dilley opined that he and the director of sales "may be the only voice of reason" at Attachmate with respect to its dispute with Saks.  (See copy of email, attached hereto as Exhibit C.)

43.  On June 12, 2014, a lawyer working in Attachmate's compliance department informed Saks' business representative that if a resolution was not reached by the end of the

month, any amicable business resolution offered by Attachmate's sales team would be "off the table."

44.     Upon information and belief, since as early as 2005, it has been Attachmate's business practice to audit its customers' use of software pursuant to their license agreements and thereafter file lawsuits alleging the customer has over installed software and must purchase large volumes of additional licenses pursuant to the terms of the parties' license agreement.

45.     Upon information and belief, since 2005 alone Attachmate has filed at least 18 lawsuits against its software customers, claiming breach of contract and copyright infringement based upon allegations that an audit revealed widespread over-installation and misuse of its software products. Each of these litigations sought damages of many millions of dollars.

46.     Based upon Attachmate's recent statements to Saks and Attachmate's established pattern of suing its customers as a result of audit disputes, Saks has a reasonable apprehension that Attachmate will file suit for breach of contract and copyright infringement and will terminate its existing purchased licenses of the Extra Software Products if Saks does not meet Attachmate's demand of purchasing approximately 3,640 additional licenses.

47.     An actual and substantial controversy exists of sufficient immediacy and reality to warrant the issuance of a declaratory judgment between Saks and Attachmate to resolve that: (1) Saks has not breached the ASLA; (2) Saks has not infringed upon Attachmate's alleged copyrights in the Extra Software Products; and (3) if the parties are bound by the ASLA, Attachmate has breached the agreement.

**FIRST CAUSE OF ACTION:**
**DECLARATORY JUDGMENT THAT SAKS HAS**
**NOT BREACHED ITS CONTRACTUAL OBLIGATIONS**

48.     Saks restates and realleges each of the allegations set forth in Paragraphs 1 through 47 above.

49.     Saks has not breached any contractual obligations owed to Attachmate under the ASLA.

50.     Because Saks has not breached its contractual obligations, it does not owe any amounts to Attachmate for such alleged breaches.

51.     Because Saks has not breached its contractual obligations, Attachmate is not entitled to terminate Saks' rights under purchased licenses for the Extra Software Products.

52.     Saks is entitled to judgment declaring that it has not breached any contractual obligation owed to Attachmate and that Attachmate is not entitled to terminate Saks' rights under purchased licenses for the Extra Software Products.

**SECOND CAUSE OF ACTION:**
**DECLARATORY JUDGMENT THAT SAKS**
**HAS NOT INFRINGED ATTACHMATE'S COPYRIGHTS**

53.     Saks restates and realleges each of the allegations set forth in Paragraphs 1 through 52 above.

54.     Attachmate claims to own copyrights in the Extra Software Products.

55.     Attachmate contends that the unlicensed copying, distribution, or use of the Extra Software Products constitutes copyright infringement.

56.     Attachmate contends that Saks has engaged in the unlicensed copying, distribution, and use of the Extra Software Products.

11

57.    Saks has not infringed and is not infringing any valid copyright owned by Attachmate or otherwise relating to the Extra Software Products.

58.    Saks is entitled to judgment declaring that it has not infringed and is not infringing any valid copyright owned by Attachmate or otherwise relating to the Extra Software Products.

## THIRD CAUSE OF ACTION:
## BREACH OF CONTRACT

59.    Saks restates and realleges each of the allegations set forth in Paragraphs 1 to 58 above.

60.    Saks has complied with all of the terms of the ASLA but Attachmate has breached the ASLA.

61.    Under the terms of the ASLA, if an audit revealed that Attachmate's customer did not have sufficient licenses of the Extra Software Products, the customer would be required to purchase the additional licenses.

62.    In response to Attachmate's claim that an audit revealed Saks was short the necessary amount of licenses, Saks offered to pay Attachmate for additional licenses of the Extra Software Products from Attachmate.

63.    Attachmate rejected Saks's offer.

64.    Attachmate has breached the ASLA by failing to accept, without justification, Saks' offer to acquire additional licenses.

WHEREFORE, Plaintiff Saks seeks judgment in its favor and against Defendant Attachmate Corporation, as follows:

      a.    Declaring that Saks has not breached any contractual obligations owed to Attachmate on the basis that Saks has complied with the obligations of the parties' agreement;

      b.    Alternatively, finding that Attachmate is in breach of its agreement with Saks;

      c.       Declaring that Saks has not infringed any valid copyright owned by
Attachmate;

      d.       Awarding Saks its costs and attorneys' fees; and

      e.       Awarding such other necessary or proper relief as justice may require.

Dated:   June 30, 2014                 Respectfully submitted,
        New York, New York

                                      By: _____

                                      John M. Callagy
                                    Andrea L. Calvaruso
                                    Ana Y. Correa
                                    KELLEY DRYE & WARREN LLP
                                    101 Park Avenue
                                    New York, NY 10178
                                    (212) 808-7800

                                    *Attorneys for Plaintiff Saks Incorporated*

**SAMPLE ONLY, LICENSE NOT VALID.**

**Attachmate(R) Software License Agreement for:**
**EXTRA! Mainframe Server Edition(TM) Version 8 or**
**EXTRA! Mainframe Server Edition(TM) for AS/400(R) or Open Systems Version 8**

1.   DEFINITIONS used in this License Agreement.

(a)   "Attachmate" means Attachmate Corporation.

(b)   "CICS Bridge Component" means the myEXTRA!(TM) Smart Connector for CICS(R) 3270 Bridge component of the SOFTWARE that is separately made available to you by Attachmate.

(c)   "CICS Region" means an area of the OS/390(R) operating system memory of an IBM(R) mainframe computer into which various CICS programs (such as BMS map sets, transactions, terminals, files, transient data queues, temporary storage queues, journals, products and users) have been loaded and are run, and further contains allocated memory for such area to use for processing transactions.

(d)   "Client Component(s)" means the following programs contained in the SOFTWARE that are designed solely for use on a Device: (i) EXTRA! X-treme(TM), (ii) EXTRA! X-treme Options, (iii) EXTRA! X-treme Connections, (iv) myEXTRA! Terminal Viewers (includes ActiveX(R), Java(TM) and Express Viewers), and (v) myEXTRA! Presentation Builder Client.

(e)   "Device" means a personal computer or electronic communication/computing device that is used by a person, and excludes any machine that primarily provides automated, unattended communications and/or services to other applications, computers or electronic devices.

(f)   "Licensed Client Device" means a single Device that has the right to use the SOFTWARE under the terms of this License Agreement and the applicable Licensed Unit(s) Certificate(s).

(g)   "Licensed Unit(s) Certificate(s)" means a document you separately acquire which contains the number of SOFTWARE units you are authorized to use in accordance with this License Agreement.

(h)   "OS/390 Option Component" means the EXTRA! Mainframe Server Edition for OS/390 Option (USS Support) component of the SOFTWARE.

(i)   "OS/390 USS Region" means the Unix System Services area of the OS/390 operating system memory of an IBM mainframe computer.

(j)   "Runtime Service" means the runtime engine module contained in the following SOFTWARE Components: (i) myEXTRA! Smart Connector for 3270 & 5250, (ii) myEXTRA! Smart Connector for IMS(TM); (iii) myEXTRA! Smart Connector for CICS; and (iv) the CICS Bridge Component.  The Runtime Service manages communications with the host or mainframe computer and processes requests and responses during execution of programs or applications created by using the designer feature of the Smart Connector Server Components.

(k)   "Server Component(s)" means the following programs contained in the SOFTWARE (or separately made available to you by Attachmate) that are designed solely for use on a server computer: (i) myEXTRA! Presentation Builder, (ii) myEXTRA! Smart Connector for CICS, (iii) myEXTRA! Smart Connector for IMS, (iv) myEXTRA! Smart Connector for 3270 & 5250, (v) myEXTRA! Management and Control Services, (vi) e-Vantage(R) WebPublish(TM) and (vii) e-Vantage SNA Gateway.

(l)   "SOFTWARE" means either the EXTRA! Mainframe Server Edition Version 8 software programs or the EXTRA! Mainframe Server Edition for AS/400 or Open Systems Version 8 software programs contained in this package. The SOFTWARE consists of several component programs and is licensed as a single software product. The SOFTWARE includes operation guides contained in or accompanying the SOFTWARE (the "Documentation").

2.   **LICENSE GRANT.  You may not exercise any of the rights granted by this License Agreement until you obtain an applicable Licensed Unit(s) Certificate which permits you to use and install up to the number of authorized SOFTWARE units printed therein in accordance with this License Agreement.**  Upon receipt of the Licensed Unit(s) Certificate, Attachmate grants you, the end user, the following rights:

(a)   If you acquired a License Unit(s) Certificate for the EXTRA! Mainframe Server Edition for AS/400 or Open Systems Version 8 SOFTWARE, then you may use such authorized SOFTWARE unit(s) to access and connect to (i) an IBM AS/400 host computer system or (ii) a Unix and/or OpenVMS host computer system, and this limitation applies to the usage rights set forth below for the Client Components, Server Components, CICS Bridge Component, and OS/390 Option Component.  You may not use the SOFTWARE to access or connect to any other type of host computer system.

(b)   For the number of SOFTWARE units stated on a Licensed Unit(s) Certificate, you may install and use up to the same number of each Client Component on an equivalent number of Licensed Client Devices.  If you wish to install and use a single copy of any Client Component on a network server, you may do so provided you have acquired the Licensed Unit(s) Certificate for the number of Devices that have the ability to access and use, directly or indirectly, the SOFTWARE from such network server.  The Client Components are licensed for one Licensed Client Device to connect to a host computer, and the Client Components are not licensed for middleware use where the Client Components are providing host connectivity to multiple Devices unless you have acquired the applicable number of authorized SOFTWARE units of EXTRA! Mainframe Server Edition

**SAMPLE ONLY, LICENSE NOT VALID.**
*EXTRA! Mainframe Server Edition v8*

**SAMPLE ONLY, LICENSE NOT VALID.**

Version 8 or EXTRA! Mainframe Server Edition for AS/400 or Open Systems Version 8 for each Device that can directly or indirectly utilize the Client Components. The component parts of the Client Components may not be separated for use on more than one Licensed Client Device or by more than one user at any time. The SOFTWARE, this License Agreement and Licensed Unit(s) Certificate(s) may not be shared with multiple Devices for concurrent use.

(c)    For the first (1st) through tenth (10th) EXTRA! Mainframe Server Edition Version 8 or EXTRA! Mainframe Server Edition for AS/400 or Open Systems Version 8 authorized SOFTWARE units acquired by you, you have the right to install and use a single copy of the (i) Server Components, (ii) CICS Bridge Component on one CICS Region, and/or (iii) OS/390 Option Component on one OS/390 USS Region. Thereafter, for every ten (10) EXTRA! Mainframe Server Edition Version 8 or EXTRA! Mainframe Server Edition for AS/400 or Open Systems Version 8 authorized SOFTWARE units you acquire, you have the right to make and use an additional single copy of each of the Server Components, CICS Bridge Component, and/or OS/390 Component, as described in the preceding sentence. For such SOFTWARE components, only Licensed Client Devices are permitted to access and use them, and (v) you may only use one installation method if more than one method is provided.

(d)    Runtime Service may only be used in conjunction with the EXTRA! X-treme, myEXTRA! Terminal Viewers or myEXTRA! Presentation Builder Client components running on a Licensed Client Device. You may not use the SOFTWARE to develop or create an application or program that generates a 3270 or 5250 terminal emulation screen.

(e)    This section applies to the EXTRA! X-treme Client Component. If you select the Central Management and Require Activation installation options, then Attachmate grants you permission to install images or copies of the EXTRA! X-treme Client Component on unlimited number of Devices within your company/organization (the "Unpaid Copies"), provided you have a process in place that prevents Devices or users from running or using the Unpaid Copies. You must purchase an additional unit of the SOFTWARE for every copy of EXTRA! X-treme Client Component that you want to run or use on a Device. No Device (or user) may run or use any Unpaid Copies.

(f)    If you are not ready to use the SOFTWARE you may instead make and use one of the following software products that you previously received for each authorized SOFTWARE unit (each an "Authorized Alternative Product"): (i) myEXTRA! Presentation Services Version 7.11 product; (ii) myEXTRA! Presentation Services Version 7.11 includes EXTRA!(R) Personal Client product; (iii) myEXTRA! Presentation Services Version 7.11 for AS/400 or Open Systems product; or (iv) myEXTRA! Presentation Services Version 7.11 for AS/400 or Open Systems includes EXTRA! Personal Client product. If you elect to use an Authorized Alternative Product, (i) you agree to use it in accordance with the Attachmate Software License Agreement accompanying it, and (ii) you will not use the SOFTWARE. You may not use both an Authorized Alternative Product and the SOFTWARE at the same time.

(g)    If you acquired the SOFTWARE subject to limited-use restrictions (e.g. limited use of certain functionality or options) agreed in separate documentation between you and Attachmate, you may only use the SOFTWARE in such limited manner. You agree that such limited-use restrictions will also apply to any replacement Attachmate product obtained through Attachmate support or maintenance programs.

(h)    You may make one backup copy of the SOFTWARE for archival purposes only and such copy must include all copyright and proprietary notices as they appear on and in the original SOFTWARE. Attachmate reserves all rights to the SOFTWARE not expressly granted to you. This License Agreement and Licensed Unit(s) Certificate(s) are your proof of license to exercise the rights granted herein and must be retained by you.

3.    TERM. This License Agreement is effective on the date you accept it and receive a Licensed Unit(s) Certificate, and will remain in force until terminated. You may terminate this License Agreement at any time and Attachmate may terminate this License Agreement if you fail to comply with any provision. Upon any termination of this License Agreement, you must destroy all of the SOFTWARE units including any archival copy(ies).

4.    OWNERSHIP. All title, patents, copyrights and any other intellectual property rights in and to the SOFTWARE, Documentation and any copies or portions thereof collectively, are owned and retained by Attachmate or its licensors and suppliers. The SOFTWARE and Documentation are protected by United States copyright laws, international treaty provisions, and United States Patents 5,754,788; 5,951,647; 6,173,319; 6,173,321; 6,252,607; 6,519,643 and 6,389,465. Other patents are pending in various countries. Except as provided in Section 2 above, you may not copy, use or distribute the SOFTWARE.

**SAMPLE ONLY, LICENSE NOT VALID.**
*EXTRA! Mainframe Server Edition v8*

**SAMPLE ONLY, LICENSE NOT VALID.**

5. EXPORT. Exportation of technical materials is strictly controlled by the United States of America ("USA") government and you must comply with the then applicable USA export laws in your use or transfer of the SOFTWARE, Documentation and any copy or portion thereof. The SOFTWARE, Documentation and any copy or portion thereof may not be sold or otherwise transferred to, or made available for use by or for: (a) any entity that is engaged in the development, design, production or use of biological, chemical or nuclear weapons or missile technology; (b) any USA embargoed destination; (c) any entity denied export privileges by a USA government agency; or (d) any entity restricted by the USA government.

6. UPDATES, UPGRADE, MIGRATION & TRADE-IN. "Updates" mean any program code designed specifically for this version of the SOFTWARE that is supplied by Attachmate to you. Attachmate may, at its sole discretion, furnish you with Updates to the SOFTWARE and any such Updates provided to you will become a part of the SOFTWARE and be subject to and governed by the terms of this License Agreement. Except as provided under (a) the remedies within the Limited Warranty and Disclaimer section set forth below or (b) an Attachmate maintenance or technical support subscription that you separately purchased, Attachmate is under no obligation to provide any Updates, upgrades, patches, bug fixes, modifications, enhancements, or maintenance or support services to you. If the Licensed Unit(s) Certificate indicates the SOFTWARE is an Upgrade or Migration, you must have licensed a prior Attachmate software product to be eligible to use this SOFTWARE. SOFTWARE acquired as an Upgrade or Migration replaces the prior Attachmate software product and you agree to erase or destroy such prior Attachmate software product upon use of the Upgrade or Migration SOFTWARE. If the Licensed Unit(s) Certificate indicates the SOFTWARE is a Trade-in, then you agree to destroy the competitive product that this SOFTWARE is replacing upon use of the Trade-in SOFTWARE.

7. OTHER RESTRICTIONS. You may not sell, rent, lease, sublicense, translate, modify, transfer or assign the SOFTWARE, nor any copy or portion thereof, nor provide commercial hosting services with the SOFTWARE, without Attachmate's prior written consent. You may not reverse engineer, decompile or disassemble the SOFTWARE, except and only to the extent that such activity is expressly permitted by applicable law notwithstanding this limitation.

8. LIMITED WARRANTY AND DISCLAIMERS.
(a) AIRCRAFT AND NUCLEAR USAGE RESTRICTION. THE SOFTWARE CONTAINS PROGRAMS WRITTEN IN JAVA. YOU THE LICENSEE ACKNOWLEDGE THAT THE SOFTWARE AND ANY APPLICATIONS YOU CREATE ARE NOT DESIGNED OR INTENDED FOR USE IN ON-LINE CONTROL OF AIRCRAFT, AIR TRAFFIC, AIRCRAFT NAVIGATION OR AIRCRAFT COMMUNICATIONS; OR IN THE DESIGN, CONSTRUCTION, OPERATION OR MAINTENANCE OF ANY NUCLEAR FACILITY. ATTACHMATE AND ITS LICENSORS AND SUPPLIERS DISCLAIM ANY EXPRESS OR IMPLIED WARRANTY OF FITNESS FOR SUCH USES.

(b) Except as set forth in Section 8.(a) above and excluding any applications you create, Attachmate warrants that the SOFTWARE will perform substantially in accordance with the Documentation for a period of ninety (90) days from the date of receipt of the SOFTWARE. Attachmate does not warrant uninterrupted or error-free operation of the SOFTWARE or that Attachmate will correct all defects. Attachmate's entire liability and your exclusive remedy will be, at Attachmate's option, either (i) replacement of the SOFTWARE media if the media is defective or (ii) provide a correction, restriction or bypass so that the SOFTWARE performs substantially in accordance with the Documentation or (iii) delete the SOFTWARE and any applications utilizing any portion of the SOFTWARE from Devices and computers and return your proof of license (and, if you received a media copy of the product, the SOFTWARE) along with your proof of purchase to the entity from whom you acquired it and receive a refund in the amount you paid for it. This Limited Warranty is void if failure of the SOFTWARE has resulted from accident, abuse, misuse or modification. Any replacement SOFTWARE will be warranted for the remainder of the original warranty or thirty (30) days, whichever is longer. In the event of refund, this License Agreement shall terminate.

(c) The Limited Warranty set forth in 8.(b) above is the only express warranty made to you. **EXCEPT FOR THE LIMITED WARRANTY SET FORTH IN 8.(b), TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ATTACHMATE AND ITS LICENSORS AND SUPPLIERS DISCLAIM ALL OTHER WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO NON-INFRINGEMENT OF THIRD PARTY RIGHTS, MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE, WITH RESPECT TO THE SOFTWARE AND DOCUMENTATION. SOME JURISDICTIONS DO NOT ALLOW LIMITATIONS ON THE DURATION OF AN IMPLIED WARRANTY, SO THE ABOVE LIMITATION MAY NOT APPLY TO YOU. THIS LIMITED WARRANTY GIVES YOU SPECIFIC LEGAL RIGHTS AND YOU MAY HAVE OTHERS, WHICH VARY BY JURISDICTION.**

**SAMPLE ONLY, LICENSE NOT VALID.**
*EXTRA! Mainframe Server Edition v8*

**SAMPLE ONLY, LICENSE NOT VALID.**

9.  LIMITATION OF LIABILITY.  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL ATTACHMATE OR ITS LICENSORS AND SUPPLIERS BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL DAMAGES WHATSOEVER (INCLUDING WITHOUT LIMITATION, DAMAGES FOR LOST PROFITS, LOST SAVINGS, LOSS OF USE, BUSINESS INTERRUPTION, LOSS OF INFORMATION OR DATA, DAMAGE TO EQUIPMENT, OR OTHER PECUNIARY LOSS) ARISING OUT OF THE USE OR INABILITY TO USE THE SOFTWARE, EVEN IF ATTACHMATE OR ITS DEALERS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. ATTACHMATE'S AND ITS LICENSORS' AND SUPPLIERS' LIABILITY FOR ANY DIRECT DAMAGES ACTUALLY PROVEN IN CONNECTION WITH THE SOFTWARE OR ITS USE, FROM ANY CAUSE WHATSOEVER AND REGARDLESS OF THE FORM OF LEGAL ACTION, SHALL NOT IN ANY EVENT EXCEED THE ACTUAL AMOUNT PAID BY YOU FOR THE SOFTWARE.  BECAUSE SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, THE ABOVE LIMITATION MAY NOT APPLY TO YOU.

10.  USA GOVERNMENT RESTRICTED RIGHTS.  The SOFTWARE is considered to be "commercial computer software" and the Documentation is considered to be "commercial computer software documentation" as such terms are used in 48 C.F.R. 12.212.  The SOFTWARE and Documentation are provided to the Department of Defense and its components subject to 48 C.F.R. 227.7202-1 through 227.7202-4.  For all other USA government agencies that procure under Federal Acquisition Regulations, the SOFTWARE and Documentation are provided with RESTRICTED RIGHTS and use, duplication or disclosure by such government agencies are subject to the restrictions set forth in the Commercial Computer Software-Restricted Rights at 48 C.F.R. 52.227-19.  Notice: Notwithstanding any other lease or license agreement that may pertain to or accompany the delivery of, this computer software, the rights of the USA government regarding its use, reproduction and disclosure are set forth in this License Agreement.  Manufacturer is Attachmate Corporation, P.O. Box 90026, Bellevue, Washington 98009-9026, USA.

11.  AUDIT.  At Attachmate's request and upon ten (10) days prior written notice, an Attachmate representative or an independent auditor selected by Attachmate may inspect and audit your computers and records for compliance with this License Agreement and Licensed Unit(s) Certificate, during your normal business hours, and no more than twice a year.  You shall fully cooperate with such audit and provide any necessary assistance and access to all records and computers.  If an audit reveals that you possess or at any time possessed unlicensed copies of the SOFTWARE, you will promptly pay Attachmate the applicable license fee for such unlicensed copies.

12.  ENTIRE AGREEMENT AND GOVERNING LAW.  This License Agreement and the Licensed Unit(s) Certificate constitute the entire understanding and agreement between you and Attachmate with respect to the SOFTWARE and Documentation.  The SOFTWARE is licensed, not sold.  Any representations or promises made by dealers and distributors of Attachmate which differ from the terms of this Agreement do not constitute warranties of Attachmate, do not bind Attachmate, and should not be relied upon.  This License Agreement is governed by and construed in accordance with the laws of the State of Washington, USA.  The U.N. Convention on Contracts for the International Sale of Goods does not apply to this License Agreement.  If you have any questions concerning this Agreement, please write to the Contracts Department at the Attachmate address above.

Attachmate, e-Vantage and EXTRA! are registered trademarks and myEXTRA!, EXTRA! Mainframe Server Edition, EXTRA! X-treme, WebPublish and the Attachmate logo and are trademarks of Attachmate Corporation.  ActiveX is a registered trademark of Microsoft Corporation in the United States and/or other countries.  AS/400, CICS, OS/390, and IBM are registered trademarks and IMS is a trademark of International Business Machines Corporation in the United States, other countries, or both.  Java is a trademark or registered trademark of Sun Microsystems, Inc. in the United States and other countries.

**SAMPLE ONLY, LICENSE NOT VALID.**
*EXTRA! Mainframe Server Edition v8*



705 5 Ave. S., Suite 1100
Seattle, WA 98104
206.217.7734 phone
206.682.962 fax
Attachmate.com

March 24, 2014

*Sent by email*

Tom Massey
VP of Infrastructure
Saks Inc.
Tom_Massey@saksinc.com

       Re:  Attachmate Review at Saks

Dear Mr. Massey:

I am a Senior Corporate Counsel for Attachmate Corporation, and I handle software license compliance issues.  As you may know, a recent audit of Saks' computing environment revealed that Saks failed to properly deploy and manage Attachmate software.  The resulting potential exposure could reach more than $6.4 million.  It is my understanding that Brent Slonecker has repeatedly attempted to work with you to resolve this shortfall.  Neither you nor anyone else from Saks has replied to Mr. Slonecker's communications for weeks.

Saks has an obligation to remedy its over-installation of Attachmate software.  While Attachmate tries to resolve all audits amicably, the company must protect its rights.  I am sure you agree that the parties would benefit from completing this transaction without additional escalation.  Please contact Brent Slonecker at brent.slonecker@attachmate.com no later than March 26, 2014, to resolve this matter.

Sincerely,

*Shelley Hall*

**Shelley Hall** | Senior Corporate Counsel



705 5th Ave. S., Suite 1100| Seattle, WA 98104 USA
206.217.7734 phone |
shelley.hall@attachmate.com | www.attachmate.com

**From:** Colin Dilley
**Sent:** Friday, May 23, 2014 12:06 PM
**To:** 'Tom Massey'
**Subject:** RE: Attachmate Discussion

Hello Tom.

I understand that you and Brent were able to have a conversation earlier this week.

I am hopeful that you and I could have a conversation today or Tuesday. Having observed this process many times over the years I do have a sense of the growing temperament and likely next steps with Brent's group. I do not think that would be constructive. Additionally, there will be a time in short-order that my hands will be 100% tied or possibly asked to leave the table. Since the Director of Sales and myself may be the only voice of reason I would hate to see the process eliminate sales.

Could we chat about a business resolution option soon ...options sales has to help with a resolution ...potentially adding value with products that Saks may be needing to solve current business issues?  (These options are of no interest to Brent's group but they could help with a business resolution to the larger picture.)

Regards,

Colin

From: Colin Dilley
**Sent:** Monday, May 12, 2014 2:34 PM
**To:** Tom Massey
**Subject:** RE: Attachmate Discussion

Hello Tom.

Could we catch up this week?

Regards,


**Colin Dilley**
Territory Manager
705 5th Avenue S., Suite 1100
Seattle, WA  98104 USA
206.217.7429  office
253.230.3022  mobile
206.734.3545  fax
colin.dilley@attachmate.com

1

⊛ Attachmate·

**From:** Brent Slonecker
**Sent:** Friday, May 09, 2014 2:12 PM
**To:** Tom Massey
**Cc:** Colin Dilley
**Subject:** RE: Attachmate Discussion

Tom,

I'm following up on our communication from earlier this week.  I'm going to be out next week, but it would be wise to connect with Colin Dilley to try to get closer to a resolution on this matter.  If we don't make some legitimate progress on this next week folks here are going to have to start thinking about taking this resolution down an alternate path, which is truly something we do not want to do, but will if necessary.

Regards,
Brent

**From:** Tom Massey [mailto:Tom_Massey@saksinc.com]
**Sent:** Tuesday, May 06, 2014 3:46 PM
**To:** Brent Slonecker
**Subject:** RE: Attachmate Discussion

Understood..

**From:** Brent Slonecker [mailto:Brent.Slonecker@Attachmate.com]
**Sent:** Tuesday, May 06, 2014 3:25 PM
**To:** Tom Massey
**Subject:** RE: Attachmate Discussion

Hi Tom,
Next week is a bit tough for me.  Do you have any remaining questions regarding the data?  If not, I think the most productive next step is for Saks to make us a counter offer.  It seems like we have been over the data and provided Saks with ample time to digest it and the license agreements.
Thanks,
Brent

**From:** Tom Massey [mailto:Tom_Massey@saksinc.com]
**Sent:** Tuesday, May 06, 2014 11:07 AM
**To:** Brent Slonecker
**Subject:** RE: Attachmate Discussion

Yes, I'm back..  Trying to get caught up on everything..
Do you want to do a quick call early next week?

I can do Monday anywhere between 3:30 CST and 5:00 CST...

Thanks

2

**From:** Brent Slonecker [mailto:Brent.Slonecker@Attachmate.com]
**Sent:** Tuesday, May 06, 2014 12:43 PM
**To:** Tom Massey
**Subject:** RE: Attachmate Discussion

Hi Tom,

I believe you're back from your travels. I know we both desire to get this matter resolved quickly. If there's any additional information you need from me, please let me know. I'd like to have this matter completed by the end of month.

Thanks,

Brent